433 F.2d 292
 David BANKS b/n/f Rosemary Banks et al., Plaintiffs-Appellants,
v.
MUNCIE COMMUNITY SCHOOLS, a corporation, N. Durward Cory as
school superintendent, Raymond E. Rothhaar as school board
member, Jack Peckinpaugh as school board member, J. Wesley
Wray as school board member, Mrs. Carolyn Kelly as school
board member, and Samuel L. Reed as school board member,
Defendants-Appellees.
 No. 18058.
 United States Court of Appeals, Seventh Circuit.
 July 8, 1970.
 
 James Manahan, Dewitt, Richards & Manahan, Indianapolis, Ind., for appellants.
 Frank E. Gilkison, Muncie, Ind., R. Stanley Lawton, Indianapolis, Ind., John B. Beasley, Frank E. Gilkison, Jr., Muncie, Ind., Donald F. Elliott, Jr., Indianapolis, Ind., for defendants-appellees, White, Haymond, Pierce, Beasley & Gilkison, Muncie, Ind., Ice, Miller, Donadio & Ryan, Indianapolis, Ind., of counsel.
 Before SWYGERT, Chief Judge, MAJOR, Senior Circuit Judge, and CAMPBELL, Senior District Judge.[1]
 SWYGERT, Chief Judge.
 
 
 1
 Plaintiffs brought this class action in the district court alleging racial discrimination and seeking a declaratory judgment and injunction prohibiting the defendants from: (1) constructing a third high school in Muncie, Indiana, which would allegedly upset the current racial balance in the two existing schools; (2) bussing elementary school pupils to schools not nearest their homes without a showing that such bussing was not conducted to maintain or promote racial or socio-economic segregation; and (3) permitting the use of Confederate symbols or other 'racially or politically inflammable' symbols at Muncie Southside High School. The district court, after trial, held for the defendants and plaintiffs brought this appeal.
 
 
 2
 * Muncie is located in the northcentral part of Indiana and has a population of approximately 67,000. The Black population is about eight and one-half per cent and about ninety per cent of the Negroes living in the Muncie area reside in one of two neighborhoods: the 'Whitely Area' and the 'Industry Area.' Pursuant to a study conducted in 1959 and up-dated in 1968,[2] the Muncie high schools are being transformed from the former single-school system to what will eventually be a three-high-school system. The original high school, Muncie Central, accommodated all students in grades nine through twelve until 1962, when the first of the three new schools, Muncie Southside, was constructed. Northwest High School is presently under construction and will be opened for the Fall 1970 term. Central will be replaced by 1972 by a new facility, Minnetristra, located near the present site.
 
 
 3
 Before Southside was constructed, the single high school in existence was, of course, perfectly integrated. After its construction, the district boundaries for Southside High School resulted in an equal percentage of Negroes-- thirteen per cent-- attending each school.
 
 
 4
 Plaintiffs allege that the selection of the site for the new Northwest High School was racially motivated,[3] and, regardless of motivation, the site selected for Northwest High School results in and promotes de facto segregation of that facility. We think plaintiffs' argument fails on both points.
 
 
 5
 First, the record discloses substantial evidence to support the conclusion by the district court that the board was not racially motivated when it chose the site for the new school. Plaintiffs fail to offer evidence of a history of racial segregation and the undisputed facts demonstrate that in the past the Muncie high school system has enjoyed near-perfect integration. Although the site of Northwest High School is located in an all-White area, the school board and the superintendent have given their assurances that the district lines will be drawn to insure racial balance. In March 1968, before the institution of the present action, the board publicly stated its opposition to segregation and its continuing commitment to equal education without regard to race or economic status. The resolution also stated the merits of the basing of selection of schoolsites and districts primarily on geographic and population factors, and continued:
 
 
 6
 Muncie Community Schools considers integration to be conducive to good and equal educational opportunities. Therefore, Negro students shall be assigned to any high school from outside its normal geographic district to the extent necessary to assure and maintain a reasonable degree of Negro enrollment in that high school. To this end the following resolution adopted on February 29, 1968, relative to the Northwest High School hereby is re-affirmed:
 
 
 7
 BE IT RESOLVED that while district lines may change from time to time, depending on population shifts, availability of staff, curriculum changes and practices, nevertheless the Board hereby announces and hereby declares that there shall be assigned to the proposed Northwest High School one-half of the high school students living in the Whitely district at the opening of said school, or an equivalent number of Negro students from any other area.
 
 
 8
 As in the past, each high school student, both Negro and white, shall continue to provide his or her transportation to high school. This does not preclude reconsideration from time to time in the future, as changed conditions, or education practices may require.
 
 
 9
 In an affidavit before the district court, the superintendent stated:
 
 
 10
 Rational attendance areas for the new Northwest High School, for the proposed new high school intended to be located on the Minnetrista site and for the present Southside High School can and will be drawn in keeping with the policies of the Muncie Community Schools as hereunder stated and in a manner that will not adversely effect the racial balance now existing in the Muncie Community high schools.
 
 
 11
 On cross-examination the superintendent stated that spot-districting or gerrymandering would be required to maintain racial integration at Northwest High School.[4] Other evidence contradicting plaintiffs' allegation of unlawful racial motivation included examples of efforts made by the board, on the junior high school and elementary levels, to maintain as much integration as possible consistent with the neighborhood school concept.
 
 
 12
 In light of this record, plaintiffs' allegation that de facto segregation will result from the construction of Northwest High School is unfounded, or, at least, premature. The factor most strongly supporting this allegation is the location of the school in an all-White area. However, the evidence supports the conclusion that the site was not chosen to promote racial segregation, but rather that the decision was based on the Flesher study,[5] which relied on nondiscriminatory reasons, in recommending the three-high-school plan.[6]
 
 
 13
 We hold, therefore, that the evidence presented at trial supports the finding of fact by the court below that, 'The Plaintiffs have not established by the greater weight of the evidence that there now is or will be racial discrimination in the high school system.'
 
 
 14
 We also agree with the district court in pointing out that future events may justify future judicial intervention. Thus, if it could be demonstrated that the policy of nonsubsidized transportation for high school students has the effect of precluding attendance at Northwest High School by a sufficient percentage of Black students in the new district, affirmative relief might be appropriate. Specifically, the present plan to assign Black students who live in the Whitely Area to Northwest High School without providing transportation might, in effect, be the same as a token 'freedom of choice' or 'free transfer' plan as was condemned in Green v. County School Board of New Kent County, 391 U.S. 430, 88 S.Ct. 1689, 20 L.Ed.2d 716 (1968); and Monroe v. Board of Commissioners of the City of Jackson, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968). See United States v. School District 151 of Cook County, Illinois, supra, 404 F.2d at 1135.
 
 
 15
 Although we appreciate plaintiffs' present position in suspecting that the board's decision was racially motivated, their suspicions have not risen to the level of proof required by the law to justify judicial intervention at this time.[7] As contrasted with cases such as United States v. School District 151, supra, plaintiffs did not demonstrate by objective proof that action by the school board was taken primarily for the purpose of furthering segregation.
 
 
 16
 The instant case involves an attempt to halt possible future segregation at the incipient stages, and thereby prevent irreparable harm to the children attending the schools in question. The thrust of plaintiffs' complaint is that integration was easy or even inevitable with one or two schools, but that future expansion of the high school system will require a genuine commitment by the local school authorities to maintain integration. Although the school board has no constitutional duty to select school sites or make other educational decisions for 'the sole purpose of relieving racial imbalance which it did not cause,' Deal v. Cincinnati Board of Education,369 F.2d 55 (6th Cir. 1966), 'it does not follow from the absence of duty to achieve racial balance that a Board may deliberately select sites to achieve racial segregation.' United States v. School District 151, supra, 404 F.2d at 1133. The absence of proof of such unlawful motivation, compelled by the prematurity of the litigation, will not preclude the plaintiffs, or others similarly situated, from bringing an action if such proof becomes available in the future. As the First Circuit stated in Springfield School Commission v. Barksdale, 348 F.2d 261, 265-266 (1st Cir. 1965):
 
 
 17
 Even though we believe no order to be presently required, the question arises whether we should nonetheless retain jurisdiction against future eventualities. * * * If defendants permanently disregard their previously announced purpose to reduce imbalance so far as educationally feasible, a new action may be brought to determine whether the plaintiffs are in that event, entitled to relief.
 
 II
 
 18
 The second issue on appeal involves plaintiffs' attack on the current, allegedly discriminatory practice of bussing White elementary pupils to several 'White' schools when there are two 'Black' schools located closer to the White pupils. The predominantly Black 'Whitely Area' (census tract 12) contains two elementary schools: East Longfellow (79 per cent Black) and West Longfellow (95 per cent Black). Adjacent to this area, on the north and the east, is a White rural area (census tract 20). Of the 383 White elementary pupils in that tract, 132 are bussed to Blaine Elementary (60 per cent White), 110 to Claypool Elementary (99.8 per cent White), and 141 to McKinley Elementary (100 per cent White). Both Blaine and McKinley are located on the south side of the Whitely Area and Claypool is located in the southeast portion of tract 20. Thus, the pupils being bussed to these schools bypass the two Longfellow schools which are closer to their homes.
 
 
 19
 Plaintiffs claim that regardless of the motivation behind this practice it is impermissible to allow the school board to bus children in a manner which perpetuates segregation when bussing them to the geographically closer Black schools would foster integration.[8] Defendants contend that in determining which schools were to receive White pupils bussed from tract 20 they did not disregard their avowed effort to achieve maximum racial balance[9] but they also considered other legitimate educational factors. Included among these factors were: (1) the availability of classroom space and the number of years the space could be used;[10] (2) the desirability of keeping together as many students as possible from a given neighborhood[11] (thus making it preferable to send two bus loads of fifty-five pupils each to one school rather than one bus load to each of two schools); and (3) the lack of lunchroom facilities at the two Longfellow schools and the presence of such facilities at Blaine, McKinley, and Claypool.[12]
 
 
 20
 We think that the record supports the district court's conclusion that 'no racially discriminatory motivation is involved in the transportation patterns maintained by the defendants, nor do those patterns result in racial segregation which could be easily changed by some other bussing system.' In Epperson v. Arkansas, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968), the Supreme Court, in striking down the Arkansas anti-evolution statute as an abridgment of the establishment clause, recognized the need for 'care and restraint' in the exercise of judicial intervention in the operation of the public schools. 'Courts do not and cannot intervene in the resolution of conflicts which arise in the daily operation of school systems and which do not directly and sharply implicate basic constitutional values.' 393 U.S. at 104, 89 S.Ct. at 270.
 
 
 21
 Before the courts will overturn a decision of a school board, therefore, there must be a showing that the decision abridges the constitutional rights of those affected. In the instant case, for example, if it were shown that the school board deliberately maintained the predominantly Black schools in a substandard condition and then used the inferiority of those schools as a reason for assigning Whites to the educationally superior schools, judicial intervention would be appropriate. Since no such inference can reasonably be drawn from the evidence presented, we affirm the ruling of the district court on this point.
 
 III
 
 22
 The final issue is whether the district court erred in refusing to enjoin the use of certain symbols by Southside High School. When Southside began operations in 1962, the students, pursuant to a general policy of the school board, voted on the symbols to be adopted by their school. In keeping with the school name they chose to pursue a theme based on the old South. Accordingly, the school flag resembles the flag of the Confederacy, the name of the athletic teams is the 'Rebels,' the glee club is called the 'Southern Aires,' and the homecoming queen is called the 'Southern Belle.'
 
 
 23
 Plaintiffs allege that the use of these symbols is offensive to the Black students at Southside, who comprise thirteen per cent of the enrollment, is inflammatory, and has discouraged Blacks from participating in the various extracurricular activities of the school. They claim that due to the effect on the Black students, the symbols violate their first amendment right of free speech. Defendants contend that the Constitution does not prohibit the use of such symbols and that they are pursuing a valid policy of allowing the pupils of all schools in the system to choose their school symbols by a democratic process.[13]
 
 
 24
 Plaintiffs point to other alleged acts of discrimination against Blacks at Southside, including the fact that no Black students are in the honor society although some are qualified, that no Blacks were cheerleaders or 'Southern Aires,' and that none were selected as finalists in a modeling contest although eleven of the 36 contestants were Black. They also rely on a 1968 report by the Indiana State Advisory Committee to the United States Commission on Civil Rights entitled 'Student Friction and Racial Unrest at Southside High School, Muncie, Indiana.' In the report, the Committee found that racial discrimination existed at the school, from both students and faculty, and that 'the use of Confederate symbols as the school's official flag and organizational names is distasteful to many Negro students and their parents.' Among the recommendations made by the Committee was the following: 'The school administration should take immediate steps to eliminate the Confederate symbols and titles used at Southside High School. It is impossible for Negro students to feel loyal to a school whose official symbols represent a system that enslaved their ancestors.'[14]
 
 
 25
 The court below found that plaintiffs made no showing of racial or political discrimination behind the defendants' policy regarding school symbols. Citing Epperson v. Arkansas, supra, the court held 'that the consistently applied policy of the defendants' does not violate the plaintiffs' right to equal protection of the law. The court went on to admonish the board, stating:
 
 
 26
 This Court would recommend to the school authorities that they exercise their discretion to bring about the elimination of school symbols which are offensive to a racial minority. I think it is axiomatic that many symbols are inappropriate for use in public institutions in this country. For instance, some such symbols are the Nazi Swastika, the hammer and sickle, the hooded white-sheet of the Ku-Klux Klan, the clenched fist, etc. Tyranny by the majority is as onerous as tyranny by a select minority. The student body's choice of symbols has been shown to be personally offensive to a significant number of the students, no matter how innocuous the symbols may originally have seemed to the young, white students. An exercise in democracy which results in offense to a sizeable number of the participants should be seriously reconsidered by the student body.
 
 
 27
 As we interpret plaintiffs' argument, they are contending that the use of Confederate symbols at Southside High School has the effect of keeping Black students out of the mainstream of school life and of denying access to extracurricular activities which could not directly exclude any student on the basis of race. We agree with plaintiffs that a state may, in appropriate cases, be precluded from expressly permitting private discriminatory conduct. E.g., Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953). In Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967), the Court held unconstitutional a state constitutional proposition which had been passed in a popular referendum and which repealed existing open housing legislation and prohibited enactment of similar legislation in the future. By its passage, the Court held, the state was encouraging and becoming substantially involved in private racial discrimination by putting the right to discriminate 'in the State's basic charter' and by making that right 'one of the basic policies of the State.' 387 U.S. at 377, 381, 87 S.Ct. at 1634. The holding in Reitman is consistent with precedent since 'access to housing may constitutionally be equated with access to the ballot box,[15] a public utility,[16] and a restaurant in a publicly owned building.'[17] Karst & Horowitz, Reitman v. Mulkey: A Telophase of Substantive Equal Protection, 1967 Sup.Ct.Rev. 39, 72-73.
 
 
 28
 Equality within the nation's public schools is no less important than equal access to the areas described above. But in the case before us, no evidence was presented which demonstrated that the Black students of Southside High School were being denied access to any of the school's facilities because of the plaintiffs have failed to establish the necessary connection between the general policy of the school board of allowing students to choose their school symbols and the discrimination allegedly practiced against the Black students. Unless such nexus can be drawn, the adoption of symbols by the majority of the students is merely the exercise of their first amendment right of free speech and the state has not insinuated itself into private acts of discrimination.[18]
 
 
 29
 We find no merit in the plaintiffs' argument that the holding in Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), precludes a school from compelling minority pupils 'to endure (offensive) official symbols at a tax supported institution which they are compelled to attend.' Tinker held that a school could not prohibit students from wearing black armbands, as symbols of dissent, while attending school since the constitutional right of free speech and expression is not shed at the schoolhouse gate. We fail to find any evidence in the record that the Black students' right of free speech and expression is being abridged by use of the Confederate symbols.[19]
 
 
 30
 Plaintiffs' reliance on School District of Abington v. Schempp, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963), and Engel v. Vitale, 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962), is also misplaced since those cases based their prohibition of religious activities in public schools on the establishment clause of the first amendment.
 
 
 31
 In conclusion, although we agree that the symbols complained of are offensive and that good policy would dictate their removal, we find no evidence in the record before us that a constitutional violation has occurred. Should such evidence become available in the future, we see nothing which bars an appropriate action at that time.
 
 
 32
 The judgment of the district court is affirmed.
 
 
 
 [1]
 Senior District Judge William J. Campbell is sitting by designation from the Northern District of Illinois
 
 
 [2]
 The study was conducted by the Bureau of Educational Research and Service of Ohio State University and was directed by W. R. Flesher
 
 
 [3]
 This court has recently held that motivation is a proper factor in determining the existence of racial discrimination. United States v. School District 151 of Cook County, Illinois, 404 F.2d 1125, 1134 (7th Cir. 1968)
 
 
 [4]
 We fail to see how, as plaintiffs contend, this latter admission establishes unlawful motivation. A state may take affirmative action to cure racial imbalance by making classifications on the basis of race. See Springfield School Committee v. Barksdale, 348 F.2d 261, 266 (1st Cir. 1965); Note, Armstrong Act-- Voluntary State Action to Eliminate De Facto Segregation, 63 N.U.L. Rev. 637, 639 (1968). Indeed, this court upheld a preliminary order requiring bussing to remedy racial segregation. United States v. School District 151 of Cook County, Illinois, 404 F.2d 1125 (7th Cir. 1968)
 
 
 [5]
 See n. 2, supra
 
 
 [6]
 Included in these reasons were: (1) furthering of the neighborhood school policy; (2) the educational desirability to change from a three-year to a four-year high school system; and (3) projected population growth in the area. Although the district court did not rely on these reasons, plaintiffs attack them on their merits. We think that, absent a showing of unlawful racial motivation, this court should not interfere with the educational decisions of the school board. See Epperson v. Arkansas, 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968)
 
 
 [7]
 We recognize that the courts have enjoined the construction of schools when their operation would result in segregated facilities. See United States v. Board of Public Instruction of Polk County, Florida, 395 F.2d 66 (5th Cir. 1968). Plaintiffs' reliance on that case is misplaced, however, since there the court's holding was based on a finding of past de jure segregation and was in furtherance of a prior order to take steps to eliminate the vestiges of the old dual system
 
 
 [8]
 Plaintiffs also claim that a reason behind the decision was a desire not to offend the residents of tract 20 by making substantial changes in the district lines
 
 
 [9]
 Defendants claim that such motivation was behind the selection of Blaine School, which was 49 per cent Black before bussing and only 40 per cent Black after bussing the White pupils to it
 
 
 [10]
 East Longfellow and West Longfellow have respective capacities for 75 and 40 more pupils. Thus, defendants claim that if 110 or more pupils were bussed from tract 20 to either Longfellow school, redistricting would be required. This would result in assigning some pupils now attending those schools to other schools, which would in turn create a safety problem since those children would have to walk through an area of heavy, congested traffic
 
 
 [11]
 Both the plaintiffs and the defendants support the neighborhood school concept, especially at the elementary level
 
 
 [12]
 Since bussed pupils cannot walk home for lunch, they must be provided with adequate in-school facilities
 
 
 [13]
 The defendants stress the educational value in allowing students to make poor as well as good choices where it affects extracurricular activities. Thus, they claim that they would not prohibit the students of a predominantly Black school to adopt 'The Black Panthers' as their symbol, regardless of the potential offensive effect on the White students
 
 
 [14]
 Plaintiffs' expert witness offered a similar conclusion at trial
 
 
 [15]
 Terry v. Adams, supra; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984 (1932)
 
 
 [16]
 McCabe v. Atchison, Topeka & Santa Fe Ry., 235 U.S. 151, 35 S.Ct. 69, 59 L.Ed. 169 (1914)
 
 
 [17]
 Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)
 
 
 [18]
 Plaintiffs appear to use the specific incidents of discrimination in Southside High School as evidence of the effect of and motivation behind the use of the symbols, rather than using the symbols to bolster an attack upon discriminatory conduct by the school
 
 
 [19]
 Plaintiffs cite a statement made at a school board meeting by the superintendent indicating that he might ban the wearing by Black students of beads, 'tikis,' or colorful Afro-American clothing, depending on 'the effect on the student body as a whole.' We are unaware, however, that such a ban was ever put into effect