Karen Renee AUGUSTUS, a minor, by Charles A. Augustus, her father and next friend, et al., etc., Plaintiffs-Appellees,

Belinda Jackson, Intervenor-Appellee,

v.

SCHOOL BOARD OF ESCAMBIA COUNTY, FLORIDA, et al., Defendants-Appellants,

Nicky D. Scapin et al., Intervenors-Appellants.

No. 73-3272.

United States Court of Appeals, Fifth Circuit.

Jan. 24, 1975.

---

Mark R. Hawes, Tampa, Fla., for Scapin, and others.

Edward T. Barfield, Pensacola, Fla., Semmes Luckett, Leon L. Porter, Jr., Clarksdale, Miss., for School Board, and others.

Norman J. Chachkin, Drew S. Days, III, Jack Greenberg, New York City, for Karen R. Augustus, and others.

Ed Duffee, Jr., Tallahassee, Fla., for Belinda Jackson.

Richard H. Frank, Ronald G. Meyer, Tampa, Fla., amicus curiae, for Fla. Ed. Assoc., Inc.

Before MOORE,* AINSWORTH and RONEY, Circuit Judges.

RONEY, Circuit Judge:

The school board and certain intervening students appeal from a permanent injunction against the use of the Confederate Battle Flag as a school symbol and the use of the name "Rebels" in connection with the school's athletic teams and other extracurricular activities. Under its continuing jurisdiction to implement desegregation of the school, the district court could properly provide some relief against these symbols to the extent that they adversely affect the establishment of a unitary system of education. Because the permanent injunction goes further than appears to have been necessary to achieve this purpose, however, we remand the case for further consideration of the breadth of the injunction and of whether the school board should be allowed to consider solutions to the

* Hon. Leonard P. Moore, Senior Circuit Judge of the Second Circuit, sitting by designation.

problems of interference with the plan of desegregation short of the total and permanent ban of the symbols required by the court's injunction.

The facts of this case and the district court's reasoning are ably set forth in the opinion reported as Augustus v. School Board of Escambia County, 361 F.Supp. 383 (N.D.Fla.1973).

This presents but one facet of an original action filed in 1960 to require that the schools of Escambia County be reorganized into a unitary system operated on a nonracial basis. The court retained jurisdiction of the matter in order to effectuate its orders, and has continued to exercise supervision under its retained jurisdiction, as required by the law of this Circuit.

During the 1972–1973 school year, the fourth year of significant integration, Escambia High was afflicted with racial disturbances within the student body, slightly less than eight percent of which was black. Four massive confrontations involved major interracial fighting. After the first, in November, law enforcement officers were called in to restore order, and they remained for the rest of the academic year. The school had to be closed twice. In addition to the four major disturbances, there were numerous lesser ones, including small-scale fights and walkouts.

One source of racial tension was black students' demands to abolish the school's Confederate symbols. The name "Rebels" had been chosen by vote of the all-white student body when the school first opened in 1958. The Confederate Battle Flag became the accepted symbol of the athletic teams that same fall. The desire to continue the use of "Rebels" and the Confederate Battle Flag was confirmed by a landslide student vote in January 1973, after two of the major confrontations had occurred. A week later the district court issued a preliminary injunction enjoining the school board from permitting (1) the use of the name "Rebels," (2) the display of the Confederate Battle Flag on school premises, with certain exceptions, and (3) the wearing or displaying of the flag on the clothes of any student while the student attended a school-sponsored activity. A week after the court's preliminary order, the third major black and white confrontation occurred—weeks later, the fourth.

After the preliminary injunction, a number of white students were permitted to intervene on the side of the school board. After a trial the district court made final its preliminary injunction. The court found that the use of the symbols was racially irritating to many black students, was a significant contributing cause of racial tension at the school, had become a focal point for racial tension, and would continue as a source of tension and a cause of violence and disruption. Although recognizing that most white students identified the symbols only with Escambia High, and not with anti-black sentiments, and that removal of the symbols might not eliminate racial tension, the court concluded that the continued presence of the symbols would adversely affect the operation of a unitary system at Escambia High by providing a continuing, visual focal point for racial tensions.

█ It is axiomatic that federal courts should not lightly interfere with the day-to-day operation of schools. *See, e. g.,* Wright v. Houston Independent School District, 486 F.2d 137 (5th Cir. 1973), cert. denied, 417 U.S. 969, 94 S.Ct. 3173, 41 L.Ed.2d 1140 (1974); Shanley v. Northeast Independent School District, 462 F.2d 960 (5th Cir. 1972). There is a serious question as to whether this case involving what name high school athletic teams will play under, and what flag the school will use for a symbol, could independently gain the attention of a federal court. *See* Banks v. Muncie Community Schools, 433 F.2d 292 (7th Cir. 1970); *cf.* Karr v. Schmidt, 460 F.2d 609 (5th Cir.) (en banc), cert. denied, 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972).

██ There is little question that, as a general rule, the community would be better served by letting the students of public high schools determine, by the democratic processes of their student

governments, the names and symbols to designate their athletic teams and school programs. The key factor that derailed that concept in this case was the violence and disruption that occurred in the educational process; violence and disruption which was focused on the use and misuse of these symbols. With violence and disruption as the key, the case presents for rationalization two concepts: one which is totally unacceptable, i. e., by creating a violent disturbance over the failure to obtain a change in the name and flag of a school's athletic teams peacefully, an unsuccessful minority may furnish a base upon which to posit a court order requiring a change in the name and flag selected by a majority of the students; and one which is worthy of consideration, i. e., where a pre-existing condition of a school which is placed under a court order to obtain a unitary school system inherently prevents students of both races from enjoying an equal education at that school, a federal court has the power and the obligation to require a change in that pre-existing condition.

■ The first two arguments of the three point brief filed by the intervening white students are easily answered by settled precedent. First, they argue that the injunction against individual students collides with the Fourteenth Amendment authority of the court limited to "state action" as opposed to "action of individuals." A court has inherent power to enter such ancillary orders as are necessary to carry out the purpose of its lawful authority. The desegregation order is admittedly within the jurisdiction of the court and the court may enter an injunction against any individual who interferes with the proper execution of that order.

■ Second, they argue that the injunction against the students collides with their First Amendment rights to freedom of speech, as explicated under Healy v. James, 408 U.S. 169, 92 S.Ct. 2338, 33 L.Ed.2d 266 (1972); Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972); Tinker v. Des Moines Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969) and University of Southern Mississippi Chapter of M.C.L.U. v. University of So. Miss., 452 F.2d 564 (5th Cir. 1971). An established exception to the First Amendment rights of students occurs, however, in cases where the exercise of that right causes violence and disruption in the educational process. Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966). Here the district court made adequate findings to place the injunctive relief well within this exception.

The third point made by intervenors presents us the issue which requires that the case be remanded for further consideration by the district court. The intervenors assert that the court's injunction against the individual students is erroneous because the school board had promulgated a written policy prohibiting the use of the involved symbols to harass or intimidate teachers or other students, directing their use and display only in good taste, and directing the policy's enforcement and providing sufficient lawmen to protect all students before Intervenor Jackson filed her complaint. On this point, the intervening white students' argument lines up with the argument of the school officials. Inherent in the argument is the assertion that had the school board been permitted time to enforce its own regulations, the violent results from the use of the symbols could have been eliminated without federal court intervention. They note that neither Intervenor Jackson, nor her witnesses, nor the trial judge ever contended that the involved symbols per se prevented a "unitary school system." They assert that Jackson and her witnesses were complaining about the misuse of said symbols by a relatively small minority of the white students and some unidentified people off-campus. They point to the express exemptions in the district court's order that permit the symbols and names to be used and displayed. The officials and intervenors state that the effect of this is to demonstrate that the symbols are not per se suppressible, but that their misuse may be prohibited.

Finally, they contend that the school board had taken appropriate action to prohibit their misuse, and that is all the relief to which Jackson should be entitled. Thus, they argue, the court's injunction, which goes much further, is in error and should be vacated.

It is readily apparent that this case is unlike the single case in this Circuit which held that the presence of Confederate insignia in a school may call for federal court intervention. In Smith v. St. Tammany Parish School Board, 448 F.2d 414 (5th Cir. 1971), we upheld a district court order banning official display of symbols "expressing the school board's or its employees' desire to maintain segregated schools," and requiring that the symbols be removed. 448 F.2d at 415. Such identification of the symbols with official resistance to a unitary system is not present in the instant case.

In the instant case the school board seeks the opportunity to reach a solution to the problems created by abusive use of the school symbols, which solution it feels can be less drastic than the total ban required by the district court's injunction. We agree that the school board should have the opportunity it seeks.

In converting to a unitary school system in which racial discrimination is eliminated root and branch, it is incumbent on the school board "to come forward with a plan that promises realistically to work, and promises realistically to work *now*." The obligation of the district court in the first instance "is to assess the effectiveness of the proposed plan in achieving desegregation," considering the facts at hand and any alternatives to the plan which may be available. Green v. County School Board of New Kent County, 391 U.S. 430, 439, 88 S.Ct. 1689, 1695, 20 L.Ed.2d 716 (1968).

The record in the present case clearly shows that the school board's efforts to achieve a unitary system were in good faith. The school board, on January 5, 1973, unanimously adopted a conciliatory agreement worked out with the NAACP in an attempt to resolve the racial dis-

turbances at Escambia High School, in which it recognized that the symbols in this case were racially irritating. The board urged the superintendent to set up comprehensive procedures immediately to deal with every irritant appropriately.

On January 15, 1973, the school board reaffirmed its policy that symbols could be used as "rallying points for athletics and other events," and not to harass or intimidate teachers or students. At that same meeting the board resolved to "take those steps necessary to see that a proper educational environment exists," stating that "[i]t is essential that school board policies and regulations may be followed." The school board sought to follow the guidelines laid down in Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966); Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966) and Tinker v. Des Moines Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). But the district court did not evaluate these regulations and the enforcement mechanism to see if in fact they would eliminate the main objection to the symbols, their use as racial irritants. Instead the district court fashioned a remedy without such consideration.

The district court recognized that the symbols were not the sole cause of racial tension at Escambia High School, even noting that the elimination of the symbols might have no effect on the disturbances. In fact, two major disturbances occurred after the issuance of the preliminary injunction in this case, raising some question as to whether the matter could have been better answered without court interference. The elimination of racial tension is a complex problem and a problem with which the school board had begun to grapple. Although it is no doubt regrettable that a majority of the white students appeared insensitive at the time to the feelings and perceptions of many of their black schoolmates, the school board's adherence to its permissive symbol selection policy should be evaluated in conjunction with its regulations for insuring against abusive or dis-

ruptive use of the symbols selected. It may have been better for all concerned had the school board simply eliminated all ethnically and racially irritating symbols from possible consideration. As the Seventh Circuit noted in Banks v. Muncie Community Schools, *supra*, quoting a district judge's admonition to the school board:

> This Court would recommend to the school authorities that they exercise their discretion to bring about the elimination of school symbols which are offensive to a racial minority. I think it is axiomatic that many symbols are inappropriate for use in public institutions in this country. For instance, some such symbols are the Nazi Swastika, the hammer and sickle, the hooded white-sheet of the Ku-Klux Klan, the clenched fist, etc.

> .    .    .    .    .

> Tyranny by the majority is as onerous as tyranny by a select minority. The student body's choice of symbols has been shown to be personally offensive to a significant number of the students, no matter how innocuous the symbols may originally have seemed to the young, white students. An exercise in democracy which results in offense to a sizeable number of the participants should be seriously reconsidered by the student body.

433 F.2d at 297–298.

■■■■ It is not the responsibility of the federal courts, however, to run public schools absent an abrogation of the responsibility by those whose duty it is to run a constitutionally acceptable school system. The fact that under the circumstances a board regulation banning all use of the symbols may have been permissible, *see* Tinker v. Des Moines Community School District, *supra*, does not impose upon the district court the right to force that drastic measure when there is a possibility that lesser restrictions might suffice.

■■■ The district court should examine the regulations and the mechanism for their enforcement for effectiveness in achieving the elimination of discrimination root and branch, and if it finds them inadequate for that purpose, it should order the school board to promulgate regulations specifically aimed at alleviating the problem of symbolic irritation. Only as a last resort should the court arrogate to itself the position of administering any part of the day-to-day operation of the school system.

As stated by the Eighth Circuit:

> The action taken by the school authorities obviously averted serious trouble and was not only practical but clearly and properly within the rights of the school officials if we are to have any discipline in our public schools. Court intervention could in such situations only serve to fan the embers of unrest. The court should never interfere except where there is a clear case of constitutional infringement.

Tate v. Board of Ed. of Jonesboro, Ark., Spec. Sch. Dist., 453 F.2d 975, 982 (8th Cir. 1972).

■■■ There is an additional reason why the permanent injunction entered by the district court must be modified. The federal court will relinquish jurisdiction when the remedy required by the original suit, the establishment of a unitary school system, has been fully achieved. At that time, presumably, any ancillary orders entered to aid the implementation of the court-ordered remedy should no longer be necessary. Therefore, the court order transcends that period of time over which the court should assert jurisdiction. To that extent at least, the order should be modified. Any injunction in circumstances of this kind should probably be temporary only and should be effective only so long as might be necessary to achieve the purpose of preventing the interference with the desegregation orders of the court.

We, therefore, remand the cause for reconsideration of whether any injunction is still necessary, when the school should be released from the effect of any injunction that may still be needed, whether an injunction against the misuse of flags and symbols would be preferable

to a complete prohibition, and whether the school board can come up with a plan that will achieve the purpose of a unitary system without interference from the federal court.

We are not unmindful of the fact that the name and flag have undoubtedly been changed by now. The students themselves and the board will know whether, except for those rabble-rousing few who might still be intent upon stirring up trouble, the school and its educational purposes might be better served by letting well enough alone. Mootness is a matter of which courts should be constantly aware. All aspects of the case as the situation exists upon remand will be before the district court for consideration.

In order not to create a hiatus where the passage of time leaves us without sufficient facts to know the effect of a withdrawal of the injunction, we merely modify the injunction to change it from permanent to temporary until further order of the district court, and remand the cause to the district court for reconsideration in the light of this opinion and the factors which we have here discussed.

Modified and remanded.

MOORE, Circuit Judge (dissenting).

When the federal courts undertake to regulate the conduct of students and spectators at football games (such as cheering and pennant waving) and the nickname (the "Rebels") by which the team be called, in my opinion they have, indeed, strayed far beyond their constitutional functions and have created a new kind of tyranny,[1] i. e. "tyranny of the courts." The imposition of the federal decree before us completely thwarts the democratic process. If the will of the vast majority (concededly a "landslide student vote") is to be overridden at the behest of a small minority (here less than eight percent of the students were black), then that concept of our so-called democratic system might as well be scrapped. If small minorities know that they can attain their goal by saying "do thus and so because we find your actions offensive to us" and can obtain a federal injunction if the majority do not bend to their demands, then federal jurisdiction will have been stretched far beyond its intended constitutional limits. Civil rights should mean civil rights for all—not merely for a militant or threatening minority. Furthermore, the constituency of the teams in various sports throughout the country should be convincing proof that sports have no racial barriers. To the contrary, they have been in the front rank in the field of wholesome integration.[2]

Nor do I find any rational relationship between the achievement of "a unitary system operated on a nonracial basis" and the nickname of an athletic team. Until a local ordinance is enacted making it a misdemeanor for a spectator to give a spontaneous rebel yell after Escambia scores a touchdown or a court order decrees that only United States Marshals be Escambia's cheerleaders, I would prefer to remain on the sidelines and let "1984"[3] approach with dire misgivings that the federal courts may substitute themselves for "big brother" in that prophetic novel fast becoming nonfiction. In short, I would reverse and vacate the injunction.

1. "Tyranny by the majority is as onerous as tyranny by a select minority." 433 F.2d at 297.

2. For example, what of the right of some well-intentioned Southerners to try to force the New York "Yankees" to abandon their nickname?

3. "1984", Orwell.