**John Zachary BRANCHE, etc., et al.,**
**Plaintiffs,**

v.

**The BOARD OF EDUCATION OF the TOWN OF HEMPSTEAD, SCHOOL DISTRICT NO. 1, et al., Defendants.**

No. 62 C 176.

United States District Court
E. D. New York.

April 9, 1962.

James F. Conway, Rockville Centre, N. Y., for defendants, in support of motion.

Jawn A. Sandifer, New York City (Robert L. Carter, New York City, Maria L. Marcus, New York City, Wilfred V. Reape, Jr., Amityville, N. Y., of counsel), for plaintiffs, opposed.

DOOLING, District Judge.

Defendants have moved for summary judgment dismissing the suit of the plaintiff grade school children (suing by their parents as next friends) for an injunction against defendants' alleged maintenance of racially segregated public grade schools and their alleged restriction of Negro children to attendance at them and defendants' alleged denial to Negro children of equal access with white children to equal facilities in the schools of the district. The complaint prays also for an injunction against a projected referendum and bond issue and a related program to enlarge two predominantly Negro schools in the district.

The gist of defendants' contention is that the facts they bring forward by the affidavit of their Superintendent of Schools demonstrate that defendants have not by any design, pattern of conduct, or contrivance created or maintained segregated education in the grade schools of the district because the distribution of white and Negro children among the six grade schools of the district is the result solely of the residential pattern of the district;[1] that the school boundary zones are not "gerrymandered" but drawn on the basis solely of the considerations proper to the design of school zones and that the schools are, similarly, properly located in the zones. On these facts, defendants contend, plaintiffs' claim is fatally defective because it requires for its support an affirmative legal duty to integrate educational facilities and there is no such legal duty as distinguished from a duty not to segregate children racially for educational purposes. Compare Borders v. Rippy, 5th Cir. 1957, 247 F.2d 268, 271; Sealy v. Dept. of Public Instruction, 3rd Cir. 1958, 252 F.2d 898; Brown v. Board of Education, D.Kan.1955, 139 F.Supp. 468, 470; Briggs v. Elliott, E.D.S.C.1955, 132 F.Supp. 776, 777 with Brown v. Board of Education, 1954, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873, 1955, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083; Cooper v. Aaron, 1958, 358 U.S. 1, 19, 78 S.Ct. 1401, 3 L.Ed.2d 5; Clemons v. Board of Education, 6th Cir. 1956, 228 F.2d 853 (but note Judge Stewart, now Mr. Justice Stewart, concurring at p. 859); Meredith v. Fair, 5th Cir. 1962, 298 F.2d 696.

The affidavit of the Superintendent of Schools supplies the following data:

Union Free School District No. 1, Town of Hempstead, Nassau County, was created by special legislative act in 1863 and is perpetuated by Article I,

sections 500.0 to 510.0 of the Nassau County Civil Divisions Act (N.Y.Laws 1939, c. 273). The School District is almost entirely within the Village of Hempstead but does not include the whole village. The population of the district is about 25,000. In May 1961 about 47% of the children in the district grade schools were Negroes and 53% were whites.[2] There were eight grade school buildings in the six school zones.

The entire school district extends only a little over two and a half miles in its direction of greatest length, a line traversing three school zones. Roughly, the school district measures two miles by one and a half miles.

Until 1949 the Board of Education had not adopted official school zone boundaries but it did so in 1949; there was an appeal to the Commissioner of Education as to the boundaries for the one predominantly Negro school, the Prospect School, apparently on a racial segregation ground. The appeal resulted in the Board's redrawing the school zone boundary for that one school; the Commissioner, in effect, approved the Board's position that the new boundary had "encompassed reasonably the area that naturally belongs to the Prospect school" as against "any charge that it discriminates between Negro and white children." The superintendent states that the boundaries of the school zones followed, wherever possible, main highways and that the schools are roughly centered in their zones and all are less than one mile from the homes of all the students.

At the time of the zoning the Board also adopted a resolution requiring all the children to attend the school of the zone of their residence except where special circumstances required attendance at special classes and except for a self-liquidating provision allowing chil-

1. It was stated orally, without contradiction, that the residential pattern was not the product of anything, such as zoning, that could be considered state action or of any system of restrictive covenants. For present purposes, it may not be presumed that the implied residential segregation could be challenged in law.

2. In the single high school of the district 31% of the students are Negroes

dren to finish in the schools they were then attending and allowing younger children to attend out-of-zone schools in which their siblings were pupils.

The school boundary zones have not been changed since 1949 but in 1953 the Marshall school was built as a feeder to the Franklin school and in 1955 the Jackson Annex was built near the Jackson school. All the other schools were apparently built in or before 1928. From 1949 to 1961 the percentage of negro children attending the schools was as follows:

| School | No. of Classrooms | Percent of Negro Children 1949 | Percent of Negro Children 1961 |
|---|---|---|---|
| Fulton | 16 | 3.2 | 1.0 |
| Washington | 13 | 4.7 | 33.0 |
| Jackson / Jackson Annex | 21 | 16.5 | 67.0 |
| Prospect | 11 | 90.9 | 86.0 |
| Ludlum | 15 | 6.4 | 5.0 |
| Franklin / Marshall | 36 | 14.3 | 78.0 |

The change in percentage is said to reflect truly the increased ratio of Negro residents in each school zone. If no significant effect flowed from the limited right to attend out-of-zone schools, the result followed inevitably from the static zone boundaries, the requirement that the children attend the school of the zone in which they lived, and the change in residential pattern.

To redistribute the children so as to have the same percentages of Negro and white children in each school would involve about 1,000 transfers. The Board rejected a proposal to effect such transfers on the grounds that they would involve more hazardous travel for the children, a serious problem in deciding whom to transfer and the possible need for transportation that could be authorized only by a favorable vote of the whole district, and that the program would cause serious disagreement along racial lines, involve jettisoning the order of the Commissioner of Education directing or approving the geographical proximity basis of school attendance, and, in the Board's considered judgment, would fail to solve the problem and require abandoning the only workable plan of school attendance for Hempstead, that is one that develops elementary school zone lines on the basis of geographical proximity.

To the general charges of maintaining unequal facilities the Superintendent has answered with a general summary of the facilities and staff assets of the district making the point that no pattern of discrimination in facilities or staff is present. He adds that 24 of the 242 teachers are Negroes and that all the schools except the Washington school have at least one Negro teacher.

The affidavit of the Superintendent states further that the Jackson School and Annex have twenty classrooms in service for 533 children and the Franklin School, with the Marshall Annex, has thirty-six classrooms in service for 976 children; the enrollment in the two schools exceeds the average class size fixed by the Board of Education for the district. The Superintendent recommended action and the Board approved the submission to the votes of the dis-

trict of a proposal to add, at a cost of $1,300,000, eleven classrooms to the Marshall Annex, two classrooms to the Jackson School, eight classrooms to the Jackson Annex and certain other substantial facilities to the three schools. Before the referendum took place a petition was filed with the State Commissioner of Education to review and arrest the Board's proceedings on the ground that they would continue existing segregation. By interim decision the Commissioner authorized the Board to proceed with the vote on the bond issue required for the building program but the Board has rescinded its resolution of submission, cancelled the registration for the election and awaits the final decision of the Commissioner of Education and the resolution of the present litigation. The Superintendent states that additional school facilities are needed.

■ The facts brought forward by the defendants do not authorize summary judgment in their favor. Defendants show facts compatible with an absence of responsibility on their part for the racial segregation that exists in the schools but these facts do not demonstrate that there has not been segregation because of race. Segregated education is inadequate and when that inadequacy is attributable to state action it is a deprivation of constitutional right.

The central constitutional fact is the inadequacy of segregated education. That it is not coerced by direct action of an arm of the state cannot, alone, be decisive of the issue of deprivation of constitutional right. Education is compulsory in New York (Education Law, § 3205); those for whom education is compulsory by reason of their age are unqualifiedly entitled to attend the public schools of their district of residence (Education Law, § 3202, subd. 1); no one may be refused admission into or excluded from any public school of the state on account of race (Education Law, § 3201); and taxation for support of the schools is mandatory (See, e. g., Education Law, §§ 1716, 1717, 2021, 2022, 2023). The educational system that is thus compulsory and publicly afforded must deal with the inadequacy arising from adventitious segregation; it cannot accept and indurate segregation on the ground that it is not coerced or planned but accepted.

■ Failure to deal with a condition as really inflicts it as does any grosser imposition of it. Cf. Miller v. Schoene, 1928, 276 U.S. 272, 279, 48 S.Ct. 246, 72 L.Ed. 568. How far that duty extends is not answerable perhaps in terms of an unqualified obligation to integrate public education without regard to circumstance and it is certainly primarily the responsibility of the educational authorities and not the Courts to form the educational system. Cf. Brown v. Board of Education, 1955, 349 U.S. 294, 299, 75 S.Ct. 753, 99 L.Ed. 1083; Sealy v. Department of Public Instruction, E.D.Pa. 1957, 159 F.Supp. 561, aff'd, 3rd Cir. 1958, 252 F.2d 898. It is unavoidably the responsibility of the Courts, however, to isolate forbidden principle and require its exclusion from the action of the educational authorities.

So here, it is not enough to show that residence accounts for the fact of segregation and to contend that therefore the segregation is ineluctable. The effort to mitigate the consequent educational inadequacy has not been made and to forego that effort to deal with the inadequacy is to impose it in the absence of a conclusive demonstration that no circumstantially possible effort can effect any significant mitigation. What is involved here is not convenience but constitutional interests. It cannot be said at this stage that the 1949 adoption of the geographical rule of school attendance was necessarily free of an unpermitted effect on constitutional interests or that adherence to it in changing circumstances that perhaps increased segregation has not become an infringement of constitutional interests. (Cf. Evans v. Buchanan, D.Del.1959, 173 F.Supp. 891); it cannot be said with certainty that increasing the size of three school buildings that are predominantly Negro schools will not, in union with contin-

154

uance of the existing geographic attendance rule, transgress the constitutional right involved. Such determinations, involving resignation to the inadequacy of education arising from the fact of segregation, if possible at all, must await the completed exploration, no less by defendants in their performance of their duty than by the parties in the course of this litigation, of all the circumstances. It may be that the depositions that plaintiffs have indicated a wish to initiate will result in the development of data useful to a final disposition. Cf. Taylor v. Board of Education, 2d Cir. 1961, 294 F.2d 36.

The pendency of the proceedings before the Commissioner of Education presents a special circumstance, particularly in view of the scope of his powers and the flexibility of solution evidently available under the Education Law. Cf. Carson v. Warlick, 4th Cir. 1956, 238 F.2d 724; McNeese v. Board of Education, E.D.Ill.1961, 199 F.Supp. 403. Compare School Board of City of Charlottesville, Va. v. Allen, 4th Cir. 1956, 240 F.2d 59; Mannings v. Board of Public Instruction, 5th Cir. 1960, 277 F.2d 370; Dove v. Parham, 8th Cir. 1960, 282 F.2d 256. Not enough appears from the papers to appraise the effect of that application; the present complaint is necessarily based on state action and it may be that the action of the Commissioner of Education is so integral to what can be rightly defined as state action as to require suspension of this case at an appropriate time to await his decision.

The imminence of a vote on the school building bonds has for the present disappeared and plaintiffs' motion to enjoin the vote was, accordingly, very properly withdrawn as needless before the date scheduled for argument. It does not, nevertheless, appear that any useful purpose would be served by considering the present motion so far as it seeks summary judgment on that point. It inures as a motion to strike certain allegations of the complaint. Those allegations are so much a part of the matter of the school building program, which is a continuing concern of the Board of Education, that they have a proper place in the case in its present posture.

Settle order on notice.