[Civ. No. 10335. Fourth Dist., Div. One. Aug. 13, 1971.]

THE PEOPLE ex rel. THOMAS C. LYNCH, as Attorney General, etc., Plaintiff and Appellant, v.
SAN DIEGO UNIFIED SCHOOL DISTRICT, Defendant and Respondent.

256

## COUNSEL

Thomas C. Lynch and Evelle J. Younger, Attorneys General, Robert H. O'Brien, Carl Boronkay and Andrea Sheridan Ordin, Deputy Attorneys General, for Plaintiff and Appellant.

Thomas A. Shannon, Higgs, Jennings, Fletcher & Mack, Jennings, Engstrand & Henrikson, Pitts Mack and Donald R. Lincoln for Defendant and Respondent.

## OPINION

**COUGHLIN, J.**—The People of the State of California, acting through the Attorney General, hereinafter referred to as petitioner, appeal from an order dismissing a petition for writ of mandate, directing the San Diego Unified School District, hereinafter referred to as The District, "to exercise its discretion to take reasonably feasible steps to prevent, alleviate and eliminate racial imbalance" in its schools. The District had filed a general and special demurrer to the petition. The court sustained the general demurrer with leave to amend, but did not pass upon the special demurrer. Petitioner did not amend. The order of dismissal followed.

■ In ruling upon a general demurrer facts expressly alleged in a petition, and also facts supplied by inference or implication from the facts expressly alleged, are deemed true. (*Daar* v. *Yellow Cab Co.*, 67 Cal.2d 695, 713 [63 Cal.Rptr. 724, 433 P.2d 732]; *Harvey* v. *City of Holtville*, 271 Cal.App.2d 816, 819 [76 Cal.Rptr. 795].) We state the facts in the case accordingly.

The petition classifies the Negro, Oriental, Mexican-American and Indian-American pupils in The District's schools as an ethnic group which is a minority of the total school population. In this opinion, as a matter of convenience, we shall refer to these pupils as the minority group and to the remaining pupils as the majority group.

"Student racial imbalance"[1] exists in The District's schools; the number of racially imbalanced schools is substantial; in 25 elementary, 3 junior high and 4 high schools the ratio between the number of pupils in the minority group in each school and the number of all pupils in the school exceeds by 15 percent the ratio between the number of pupils in the minority group in the school system and the number of all pupils in the system; and in 54 elementary, 3 junior high and 4 high schools the ratio between the number of pupils in the majority group in each school and the number of all pupils in the school exceeds by 15 percent the ratio between the number of pupils in the majority group in the system and the number of all pupils in the system.

The existence of student racial imbalance in its schools is known to The District in that (1) a survey in August 1966, the results of which were

---

[1] Quotations in our statement of facts are from the petition.

set forth in a report to it by its Citizens Committee, showed the Negro pupil population of the schools in the district was 10.7 percent of the total pupil population whereas there were 15 elementary, 2 junior high and 2 high schools where the Negro pupil population in each school was over 50 percent of the total pupil population in the school; (2) the student racial imbalance in The District's schools has not improved since it received the aforesaid report; and (3) a survey made in October 1968 showed the Negro pupil population of the schools in the district was 12.6 percent of the total pupil population and the Mexican-American pupil population was 10.1 percent of the total pupil population whereas in 15 elementary, 2 junior high and 2 high schools the Negro pupil population of each school exceeded 50 percent of the total pupil population in the school, and in 1 elementary school the Mexican-American pupil population exceeded 50 percent of the total pupil population in the school.

There are several reasonably feasible plans available to The District for correcting the student racial imbalance in its schools, but The District refuses "to take adequate, reasonably feasible steps, or any steps at all, to prevent, alleviate or eliminate racial imbalance" in The District's schools; and "has, *inter alia,* by a policy of maintaining neighborhood attendance zones and optional attendance zones, and by other devices, perpetuated and extended racial imbalance in its schools, and will continue to do so."

The District's acts and "failure to take reasonably feasible steps to prevent, alleviate and eliminate substantial racial imbalance in its schools resulted in and will continue to result in irreparable injury to the People of the State of California in that attendance at racially imbalanced schools denies students an equal educational opportunity, causes social and psychological injury to said students, and thwarts the ability of students to learn and exchange views with other students."

█ At the outset we consider and reject The District's contention the Attorney General lacks standing to bring the action. █ Our conclusion is premised on the settled rule in California that the Attorney General is authorized "to file any civil action for the enforcement of the laws of the state or the United States Constitution, which in the absence of legislative restriction he deems necessary for the protection of public rights and interests." (*People* ex rel. *Lynch* v. *Superior Court,* 1 Cal.3d 910, 912, fn. 1 [83 Cal.Rptr. 670, 464 P.2d 126].) █ It is in the public interest to require a school district to comply with the provisions of the United States Constitution guaranteeing equal protection of the laws. There is no legislative restriction in the premises. The District's contention to the contrary is without merit.

█ In concise summary, the complaint alleges student racial im-

balance exists in The District's schools; attendance at racially imbalanced schools denies students equal educational opportunities, causes them social and psychological injury, and thwarts their ability to learn; there are several reasonably feasible plans available to The District to correct the existing racial imbalance in its schools; The District refuses to take steps invoking these plans or any steps to prevent, eliminate or reduce the racial imbalance in its schools; instead, The District by its policies, has perpetuated and extended racial imbalance in its schools.

The issue on appeal is whether the foregoing facts constitute a cause of action in mandamus for an order directing The District to take available, reasonably feasible steps to alleviate the racial imbalance in its schools.

We consider, first, pertinent principles of law; secondly, the sufficiency of the facts alleged in the complaint to state a cause of action in mandate under these principles; and, interjectionally, questions whether the existence of certain material facts is a determination made by the court as a matter of law or is dependent upon a finding on an issue of fact supported by evidence.

In *Brown v. Board of Education of Topeka,* 347 U.S. 483 [98 L.Ed. 873, 74 S.Ct. 686] (*Brown* I), the Supreme Court of the United States held state action effecting racial segregation of children in public schools denies "the minority group" equal protection of the law; violates the Fourteenth Amendment of the federal Constitution; and is subject to appropriate remedial judicial decree. In a later decision in the same case, *Brown v. Board of Education of Topeka, Kansas,* 349 U.S. 294, 298 [99 L.Ed. 1083, 1105, 75 S.Ct. 753, 755] (*Brown* II), the court referred to its former holding as a declaration of the "fundamental principle that racial discrimination in public education is unconstitutional" to which "[a]ll provisions of federal, state, or local law requiring or permitting such discrimination must yield." (See also *Green v. County School Bd. of New Kent Co., Va.,* 391 U.S. 430 [20 L.Ed.2d 716, 88 S.Ct. 1689].) The *Brown* decisions concerned a school system maintaining separate, racially segregated schools. In *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U.S. 1, 5 [28 L.Ed.2d 554, 560, 91 S.Ct. 1267], the Supreme Court epitomized its decision in *Brown* I as a mandate "to eliminate racially separate public schools established and maintained by state action." The decision in *Brown* I was premised on the determination, as a matter of law, state enforced segregation of children in public schools solely on the basis of race deprives the "minority group" of equal educational opportunities. (*Brown v. Board of Education of Topeka, supra,* 347 U.S. 483, 493 [98 L.Ed. 873, 880, 74 S.Ct. 686, 691].) Basic to this determination was the conclusion, also as a matter of law, "separate educational facilities

are inherently unequal" because the segregation in public schools of a minority group from a majority group, solely on the basis of race, "generates a feeling of inferiority as to their status in the community that may affect their hearts and minds in a way unlikely ever to be undone." (*Brown* v. *Board of Education of Topeka, supra,* 347 U.S. 483, 493-494 [98 L.Ed. 873, 880-881, 74 S.Ct. 686, 691, 692]; see also *Jackson* v. *Pasadena City School Dist.,* 59 Cal.2d 876, 880 [31 Cal.Rptr. 606, 382 P.2d 878]; *San Francisco Unified School Dist.* v. *Johnson,* 3 Cal.3d 937, 949 [92 Cal. Rptr. 309, 479 P.2d 669].) Hereinafter we consider further the rationale in *Brown* I and its relation to some of the issues at hand.

The principles declared and conclusions reached in *Brown* I have been applied not only to school systems effecting racial segregation by the use of separate schools for separate racial groups, which was the situation in both *Brown* I and *Swann,* but also to those regulating the assignment of students to particular schools in a manner producing an imbalance in the ratio between racial groups in the particular schools when compared with the ratio between the racial groups in the school system. (*Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876; *United States* v. *Jefferson County Board of Education,* 372 F.2d 836, 846, fn. 5; *Springfield School Committee* v. *Barksdale,* 348 F.2d 261, 262; gen. see *Downs* v. *Board of Education of Kansas City,* 336 F.2d 988, 996 (cert. den. 380 U.S. 914 [13 L.Ed.2d 800, 85 S.Ct. 898]); cf. *Bell* v. *School City of Gary, Indiana,* 324 F.2d 209, 212-213 (cert. den. 377 U.S. 924 [12 L.Ed.2d 216, 84 S.Ct. 1223]).)

The mandate of *Brown* I, which is reiterated in *Swann,* is directed to the elimination of segregation in public schools which is the product of state action, i.e., state or local law. The Fourteenth Amendment to the federal Constitution, upon which *Brown* I is predicated, proscribes state action denying equal protection of the law; not individual action or other factors not the product of state action.

In *Swann* the court persistently referred to the segregation to which its decision was directed as "state-imposed," "legally-imposed" or "state-enforced" segregation. (*Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. 1, 11, 14, 18, 21, 26 [28 L.Ed.2d 554, 564, 565, 567, 569, 570, 572, 91 S.Ct. 1267, 1274, 1275, 1277, 1278, 1279, 1281].)

The courts have denoted segregation which is the product of state action as "de jure" segregation and that which is the product of factors other than state action as "de facto" segregation. (Gen. see *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, 954, 956; *Deal* v. *Cincinnati Board of Education,* 419 F.2d 1387, 1388.)

In any event, the segregation of children in public schools on the basis of race is an evil constitutionally proscribed where it is the product, either directly or indirectly, of racially motivated state action. (*Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. 1, 22 [28 L.Ed.2d 554, 570, 91 S.Ct. 1267, 1279]; *Banks* v. *Muncie Community Schools,* 433 F.2d 292, 295; *United States* v. *School District 151 of Cook County, Illinois,* 404 F.2d 1125, 1131-1132; *United States* v. *Jefferson County Board of Education, supra,* 372 F.2d 836, 875-876; *Holland* v. *Board of Public Instruction,* 258 F.2d 730, 732.)

A majority of the courts hold segregation which is not the product of state action intentionally motivated for the purpose of effecting segregation on the basis of race, is not subject to correction by judicial decree as a constitutional law enforcement procedure; a state, including its agencies, does not have an affirmative duty to relieve racial imbalance in its schools which it did not cause; and state action, such as the assignment of students pursuant to a neighborhood school attendance policy, entertained without intent or purpose to effect, maintain or perpetuate racial imbalance in its schools which nevertheless results in such imbalance, is not constitutionally proscribed. (*Banks* v. *Muncie Community Schools, supra,* 433 F.2d 292, 294; *Norwalk CORE* v. *Norwalk Board of Education,* 423 F.2d 121, 122; *Deal* v. *Cincinnati Board of Education, supra,* 419 F.2d 1387, 1390; *United States* v. *School District 151 of Cook County, Illinois, supra,* 404 F.2d 1125, 1130; *Offermann* v. *Nitkowski,* 378 F.2d 22, 24; *Board of Education of Oklahoma City Pub. Sch.* v. *Dowell,* 375 F.2d 158, 166 (cert. den. 387 U.S. 931 [18 L.Ed.2d 993, 87 S.Ct. 2054]); *Deal* v. *Cincinnati Board of Education,* 369 F.2d 55, 58, 61 (cert. den. 389 U.S. 847 [19 L.Ed.2d 114, 88 S.Ct. 39]); *Springfield School Committee* v. *Barksdale, supra,* 348 F.2d 261, 264; *Gilliam* v. *School Board of City of Hopewell, Virginia,* 345 F.2d 325, 328; *Downs* v. *Board of Education of Kansas City, supra,* 336 F.2d 988, 995 (cert. den. 380 U.S. 914 [13 L.Ed.2d 800, 85 S.Ct. 898]); *Bell* v. *School City of Gary, Indiana, supra,* 324 F.2d 209, 213; *Kelley* v. *Metropolitan County Board of Education,* 317 F.Supp. 980, 986; *Keyes* v. *School District Number One, Denver, Colorado,* 313 F.Supp. 61, 76; *Davis* v. *School District of City of Pontiac, Inc.,* 309 F.Supp. 734, 742; *Norwalk CORE* v. *Norwalk Board of Education,* 298 F.Supp. 213, 224; gen. see *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, 957, fn. 26; see also *United States* v. *Jefferson County Board of Education, supra,* 372 F.2d 836, 873, 876; *Gompert's* v. *Chase,* No. C-71 1307-RHS-U.S.Dist.Ct., No.Dist. of Cal.)

Under the corollary to this rule, however, extant de facto segregation intentionally maintained and perpetuated by racially motivated state action

becomes constitutionally proscribed de jure segregation. (*United States* v. *Board of Education, I.S.D. No. 1, T.C., O.,* 429 F.2d 1253, 1258-1259; *United States* v. *School District 151 of Cook County, Illinois, supra,* 404 F.2d 1125, 1130-1131; *Brewer* v. *School Board of City of Norfolk, Virginia,* 397 F.2d 37, 41; *Wheeler* v. *Durham City Board of Education,* 346 F.2d 768, 774; *Taylor* v. *Board of Ed. of City Sch. Dist. of New Rochelle,* 294 F.2d 36, 39 (cert. den. 368 U.S. 940 [7 L.Ed.2d 339, 82 S.Ct. 382]); *Holland* v. *Board of Public Instruction, supra,* 258 F.2d 730, 731; *Kelley* v. *Metropolitan County Board of Education, supra,* 317 F.Supp. 980, 986; *Spangler* v. *Pasadena City Board of Education,* 311 F.Supp. 501, 522; *Davis* v. *School District of City of Pontiac, Inc., supra,* 309 F.Supp. 734, 744; also see gen. *Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. 1 [28 L.Ed.2d 554, 91 S.Ct. 1267, 1268].) In *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, 958, the court said: When "the state undertakes to preserve de facto school segregation, or to hamper its removal, such state involvement transforms the setting into one of de jure segregation."

▮ The issue of motivation, intent or purpose in the premises is a question of fact. (*United States* v. *School District 151 of Cook County, Illinois, supra,* 404 F.2d 1125, 1131, 1133; *Taylor* v. *Board of Ed. of City Sch. Dist. of New Rochelle, supra,* 294 F.2d 36, 38; *Davis* v. *School District of City of Pontiac, Inc., supra,* 309 F.Supp. 734, 744.) ▮ The intention to perpetuate existing de facto segregation may be evidenced by adherence to assignment, zoning, school construction, site selection and similar policies effecting this result. (*United States* v. *School District 151 of Cook County, Illinois, supra,* 404 F.2d 1125, 1131, 1133; *Brewer* v. *School Board of City of Norfolk, Virginia, supra,* 397 F.2d 37, 41; *Wheeler* v. *Durham City Board of Education, supra,* 346 F.2d 768, 774; *Spangler* v. *Pasadena City Board of Education, supra,* 311 F.Supp. 501, 522; *Davis* v. *School District of City of Pontiac, Inc., supra,* 309 F.Supp. 734, 746; *United States* v. *School District 151 of Cook County, Illinois,* 286 F.Supp. 786, 798.) On the other hand, the non-existence of racially oriented motive, intent or purpose attendant upon state action maintaining an existent de facto segregation in schools may be evidenced by such factors as the costs incident to a change, the availability of facilities, or the safety standards of students. (*Banks* v. *Muncie Community Schools, supra,* 433 F.2d 292, 293, 294, 296; *Springfield School Committee* v. *Barksdale, supra,* 348 F.2d 261, 264; *Bell* v. *School City of Gary, Indiana, supra,* 324 F.2d 209, 213; cf. *United States* v. *School District 151 of Cook County, Illinois, supra,* 404 F.2d 1125, 1133.)

A minority of the courts hold there is a constitutional duty on the state and its agencies maintaining public schools where de facto segregation

exists to remedy the resultant racial imbalance. (*Kelley* v. *Metropolitan County Board of Education, supra,* 317 F.Supp. 980, 986; *Spangler* v. *Pasadena City Board of Education, supra,* 311 F.Supp. 501, 522; *Hobson* v. *Hansen,* 269 F.Supp. 401, 497, 503-506; *Blocker* v. *Board of Education of Manhasset, New York,* 226 F.Supp. 208, 226; *Branche* v. *Board of Education of Town of Hempstead,* 204 F.Supp. 150, 153; *Soria* v. *Oxnard School Dist.,* Civ. 70 396-HP, U.S.Dist.Ct., Central Dist. of Cal.; see also *Brewer* v. *School Board of City of Norfolk, Virginia, supra,* 397 F.2d 37, 42.)

The basis for the difference between the majority and minority rules rests upon a difference in accent upon the reasons for the decision in *Brown* I. The majority rule accents the constitutional condemnation in *Brown* I of segregation which is the product of racially inspired state action. The minority rule accents the determination in *Brown* I that racial segregation in public schools constitutes a denial of equal protection of the law because it denies the minority race in such schools equal educational opportunities. (Gen. see *United States* v. *Jefferson County Board of Education, supra,* 372 F.2d 836, 873, 875.)

The consuming course of the decision in *Brown* I was the rejection, as applied to state-imposed public school segregation, of the "separate but equal" doctrine condoning state action effecting racial segregation where the facilities furnished a minority race, although separate from, were equal to the facilities furnished the majority. Rejection of the "separate but equal" doctrine was premised on the determination, as a matter of law, state-imposed racial segregation in schools denies the minority group "equal educational opportunities." There was no issue in *Brown* I respecting the fact the segregation was state-imposed. The courts adopting the minority rule rely upon the denial of equal educational opportunities determination in *Brown* I as a basis for the conclusion, as a matter of law, racial segregation, regardless of its cause, denies the minority group equal educational opportunities. The racial segregation which *Brown* I determined denied the minority group equal education opportunities, as a matter of law, is state-imposed segregation. It is the racial bigotry of a society evidenced by and incorporated in its state-imposed school segregation that denies the minority race equal educational opportunities. Segregation imposed on a minority race in such a society denies the members of the minority race the educational opportunities attendant upon the association of all races in a school atmosphere which tends to ameliorate rather than to accentuate racial prejudice and its invidious discriminating consequences. ██ From the foregoing we conclude, although under the rule in *Brown* I state-imposed racial segregation in public schools, as a matter of law, denies the minority group equal educational opportunities, whether racial segregation

in public schools which is the product of factors other than state action denies the minority group equal educational opportunities, may be a question of fact dependent upon the circumstances in the particular case. (*Deal* v. *Cincinnati Board of Education, supra,* 419 F.2d 1387, 1393; *Springfield School Committee* v. *Barksdale, supra,* 348 F.2d 261, 264; *Keyes* v. *School District Number One, Denver, Colorado, supra,* 313 F.Supp. 61, 77, 83; *Hobson* v. *Hansen, supra,* 269 F.Supp. 401, 504.)

The distinction between racial segregation in public schools which is the product of state action, directly or indirectly, and that which is the product of factors other than state action, i.e., the difference between de jure and de facto segregation, was considered by our Supreme Court in *Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, and *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937. *Jackson* concerned the action of a school board intentionally manipulating boundaries of school attendance zones for the purpose of excluding Negroes from attending certain schools; the court sustained the petition of a Negro boy seeking admission to one of these schools, and in the course of its opinion said:

"Although it is alleged that the board was guilty of intentional discriminatory action, it should be pointed out that even in the absence of gerrymandering or other affirmative discriminatory conduct by a school board, a student *under some circumstances* would be entitled to relief where, by reason of residential segregation, substantial racial imbalance exists in his school. . . . Residential segregation is in itself an evil which tends to frustrate the youth in the area and to cause anti-social attitudes and behavior. Where such segregation exists it is not enough for a school board to refrain from affirmative discriminatory conduct. The harmful influence on the children will be reflected and intensified in the classroom if school attendance is determined on a geographic basis without corrective measures. The right to an equal opportunity for education and the harmful consequences of segregation require that school boards take steps, *insofar as reasonably feasible,* to alleviate racial imbalance in schools regardless of its cause." (Italics ours.) (*Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, 881.)

The discriminatory action of the school board in *Jackson* clearly was unconstitutional under *Brown* I, and the foregoing statements were not essential to the decision in the case. Nevertheless, the majority opinion in *San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, 958, declares:

"This court, in *Jackson* v. *Pasadena City School Dist.* (1963) 59 Cal. 2d 876 [31 Cal.Rptr. 606, 382 P.2d 878], . . . took a position squarely in favor of enforcing an affirmative duty to eradicate school segregation regardless of its cause."

In the course of its opinion the court noted and quoted the declaration in *Brown* I that the opportunity for an education, "where the state has undertaken to provide it, is a right which must be made available to all on equal terms." (*Brown* v. *Board of Education of Topeka, supra,* 347 U.S. 483, 493 [98 L.Ed. 873, 880, 74 S.Ct. 686, 691].) However, the court concluded: "We need not, . . . for the purposes of this case, rely on the affirmative duty to desegregate set forth in *Jackson.*"

Not discussed in the opinion, and left for further consideration, was the fact the court in *Jackson* unmistakably qualified the duty of school authorities to take steps to alleviate de facto racial imbalance in schools; preceded its declaration a student would be entitled to relief where substantial racial imbalance exists in his school by reason of residential segregation, with the phrase "under some circumstances"; limited the duty to take steps to alleviate the racial imbalance to those "reasonably feasible"; and concluded its opinion with the following statement:

"School authorities, of course, are not required to attain an exact apportionment of Negroes among the schools, and consideration must be given to the various factors in each case, including the practical necessities of governmental operation. For example, consideration should be given, on the one hand, to the degree of racial imbalance in the particular school and the extent to which it affects the opportunity for education and, on the other hand, to such matters as the difficulty and effectiveness of revising school boundaries so as to eliminate segregation and the availability of other facilities to which students can be transferred." (*Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, 882.)

 Premised on the principles stated in *Brown, Jackson* and *San Francisco Unified School Dist.,* and upon other considerations heretofore noted, we conclude school authorities in California have a constitutional duty to "take steps, insofar as reasonably feasible, to alleviate racial imbalance in schools regardless of its cause" where the imbalance denies the minority group equal educational opportunities. (*Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, 881.) The action of school authorities in maintaining de facto racially imbalanced public schools is not a denial of equal protection of the law unless the imbalance denies the minority group equal educational opportunities. (*Deal* v. *Cincinnati Board of Education, supra,* 419 F.2d 1387, 1393; *Deal* v. *Cincinnati Board of Education, supra,* 369 F.2d 55; *Blocker* v. *Board of Education of Manhasset, New York, supra,* 226 F.Supp. 208, 230; *Springfield School Committee* v. *Barksdale, supra,* 348 F.2d 261, 263.) In each case seeking relief from such imbalance the court must determine whether the imbalance is of such a degree it affects the educational opportunities of

the minority group; whether, under the circumstances, the minority group, in fact, is denied equal educational opportunities; and whether available steps to alleviate the imbalance are reasonably feasible in light of the degree of the imbalance and the practical necessities of governmental operation.

The issue whether de facto racial imbalance in public schools denies minority students equal educational opportunities poses the more specific issue whether the imbalance, under the circumstances of the particular case, deprives them of educational opportunities they would receive absent such imbalance. The degree of imbalance which in one community may have the effects deplored in *Brown I, Jackson* and *San Francisco Unified School Dist.*, in another community may not have these effects. Hopefully in some communities the effect of racial bigotry may have been minimized to the extent the effect of racial imbalance in schools upon the educational opportunities of the minority students attending them is inconsequential.

■■■ Where the racial imbalance is de facto, its effect on educational opportunities ordinarily is a question of fact. (*Deal* v. *Cincinnati Board of Education, supra,* 419 F.2d 1387, 1393; *Deal* v. *Cincinnati Board of Education, supra,* 369 F.2d 55.)

■■■ Conformance to constitutional standards does not require school authorities to alleviate every racial imbalance in public schools. (*Jackson* v. *Pasadena City School Dist., supra,* 59 Cal.2d 876, 882.) In *Swann* the court said: "The constitutional command to desegregate schools does not mean that every school in every community must always reflect the racial composition of the school system as a whole.

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"In light of the above, it should be made clear that the existence of some small number of one-race, or virtually one-race, schools within a district is not in and of itself the mark of a system which still practices segregation by law." (*Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. 1, 24-26 [28 L.Ed.2d 554, 571-572, 91 S.Ct. 1267, 1280-1281]; see also *United States* v. *Jefferson County Board of Education, supra,* 372 F.2d 836, 846, fn. 5.)

The declaration aforesaid applies equally to de facto as well as to de jure segregation.

■■■ In ruling upon constitutional issues, courts should be hesitant to premise a decision upon facts the existence of which is based on judicial knowledge rather than upon facts the existence of which is proven in a judicial proceeding, lest, in their zeal to protect constitutional rights, they exceed the scope of judicial inquiry and invade the domain of administra-

tive determination. (*Banks* v. *Muncie Community Schools, supra,* 433 F. 2d 292, 296; *Deal* v. *Cincinnati Board of Education, supra,* 419 F.2d 1387, 1393; gen. see *Gomillion* v. *Lightfoot,* 364 U.S. 339, 343-344 [5 L.Ed.2d 110, 114-116, 81 S.Ct. 125, 128]; *Branche* v. *Board of Education of Town of Hempstead, supra,* 204 F.Supp. 150, 153.) In *Swann* v. *Charlotte-Mecklenburg Board of Education, supra,* 402 U.S. 1, 16 [28 L.Ed.2d 554, 566, 91 S.Ct. 1267, 1276], the court cautioned, "it is important to remember that judicial powers may be exercised only on the basis of a constitutional violation. Remedial judicial authority does not put judges automatically in the shoes of school authorities whose powers are plenary. Judicial authority enters only when local authority defaults."

 The issue of feasibility, likewise, involves considerations which in many instances are matters of administrative determination rather than judicial decision. Pertinent is the observation of the court in *United States* v. *Jefferson County Board of Education, supra,* 380 F.2d 385, 389, footnote 1, that a "de facto segregation resulting from residential patterns in a non-racially motivated neighborhood school system has problems peculiar to such a system. The school system is already a unitary one. The difficulties lie in finding state action and in determining how far school officials must go and how far they may go in correcting racial imbalance. . . . A broad-brush doctrinaire approach, therefore, that *Brown's* abolition of the dual school system solves all problems is conceptually and pragmatically inadequate for dealing with de facto-segregated neighborhood schools." Whether available steps to alleviate an existing imbalance are reasonably feasible requires a consideration not only of such matters as the cost involved, the availability and selection of sites, the size of the schools, the effectiveness of zone changes and the safety of students (*Bell* v. *School City of Gary, Indiana, supra,* 324 F.2d 209, 212), but also of the relation between these matters, the degree of the existing imbalance, and the effect of the imbalance on educational opportunities under the circumstances. Compliance with constitutional standards does not require the use of school funds to confer educational opportunities upon a minority group attending de facto racially imbalanced schools, which they do not receive because of the imbalance, at the expense of other essential and equally important educational opportunities conferred equally upon both the minority and majority groups. Whether in a particular case the steps available to alleviate an existing imbalance are reasonably feasible is an issue ordinarily determinable as a question of fact.

 Applying the principles of law heretofore considered to the case at bench, we conclude the facts directly alleged in the complaint, and the inferences reasonably deducible therefrom, state a cause of action in man-

damus to compel the district to take available reasonably feasible steps to alleviate the existing imbalance in its schools because it is the product of racially motivated state action perpetuating and extending a previously existing imbalance whatever may have been its cause, and also because the existing imbalance, regardless of its cause, denies students of the minority group equal educational opportunities, causes them social and psychological injury and thwarts their ability to learn.

The fact, as alleged, the district by a policy of maintaining neighborhood attendance zones, optional attendance zones and other devices, has perpetuated and extended, and will continue to perpetuate and extend racial imbalance in its schools, and refuses to take available reasonably feasible steps to alleviate the imbalance, supports a conclusion the existing racial imbalance is the product of racially motivated state action; or, stated otherwise, supports the conclusion an assumed previously existing de facto imbalance has become de jure.[2]

The fact, alleged in the complaint directly or by implication, the racially imbalanced schools maintained by The District deny students of the minority group attending them equal educational opportunities, causes them social and psychological injury and thwarts their ability to learn, which can be alleviated by available reasonably feasible steps, supports the conclusion the refusal of The District to take these steps is state action denying these students equal protection of the law.

Encompassed within the scope of the complaint, although not presented adequately by appropriate allegations, is the issue whether the existing racial imbalance in the district's schools is the product of state-enforced racially motivated segregation in residential areas. In California, until the decision in *Cumings* v. *Hokr,* 31 Cal.2d 844 [193 P.2d 742], the state, through its courts, unconstitutionally enforced covenants preventing the occupancy of real property by members of a minority race. ▓▓ Racial imbalance in schools which, by virtue of neighborhood school attendance, construction or site selection policies, is the product of a state-enforced racial imbalance in residential areas, is constitutionally condemned. (*San Francisco Unified School Dist.* v. *Johnson, supra,* 3 Cal.3d 937, 956; *United States* v. *Board of Education, I.S.D. No. 1, T.C., O., supra,* 429 F.2d 1253, 1258; *Taylor* v. *Board of Ed. of City Sch. Dist. of New Ro-*

---

[2]Several courts have found allegedly de facto imbalanced schools in fact are de jure imbalanced school systems. (*Spangler* v. *Pasadena City Board of Education, supra,* 311 F.Supp. 501, 522; *Johnson* v. *San Francisco Unified School Dist.,* Civ. No. 70 1331-SAW, U.S. Dist. Ct., No. Dist. of Calif.; *Soria* v. *Oxnard School Dist. Board of Trustees,* Civ. No. 70 396-HP, U.S. Dist. Ct., Central Dist. of Cal.; Crawford v. Board of Education of the City of Los Angeles, Los Angeles Superior Court No. 822854, Superior Court of Los Angeles County.)

*chelle, supra,* 294 F.2d 36, 38; *Spangler* v. *Pasadena City Board of Education, supra,* 311 F.Supp. 501; *Davis* v. *School District of City of Pontiac, Inc., supra,* 309 F.Supp. 734, 744.)

Some of the principles of law stated in our opinion are relevant to a trial of the case rather than a determination of the sufficiency of the complaint to state a cause of action. The purpose of stating them is to guide the trial court in its further consideration of the case.

Defendant's demurrer to the complaint was general and special. The order sustaining the general demurrer was error. The court did not rule upon the special demurrer. The complaint is uncertain in many particulars. The court should rule upon the special demurrer, and in the event it is sustained, grant leave to amend.

The conclusions heretofore noted are determinative of the appeal in this case and, for this reason, other contentions raised in the briefs need not be discussed.

The judgment is reversed with instructions to the trial court to set aside its order sustaining defendant's general demurrer and rule upon the special demurrer.

Brown (Gerald), P. J., and Ault, J., concurred.

A petition for a rehearing was denied August 31, 1971, and respondent's petition for a hearing by the Supreme Court was denied October 6, 1971.