## BORDERS ET AL. *v.* BOARD OF EDUCATION OF PRINCE GEORGE'S COUNTY ET AL.

[No. 130, September Term, 1971.]

*Decided May 15, 1972.*

*Motions for rehearing filed May 17, 1972, and June 9, 1972; denied May 17, 1972, and June 9, 1972, respectively.*

The cause was argued before HAMMOND, C. J. and BARNES, FINAN, █ SINGLEY and SMITH, JJ.

*Charles A. Dukes, Jr.,* with whom were *Dukes, Troese, Mann & Wilson, Jo B. Fogel* and *Lawrence G. Hogan* on the brief, for appellants.

*Paul M. Nussbaum,* with whom was *Stanley H. Goldstein* on the brief, for appellees.

FINAN, J.*, delivered the opinion of the Court.

The present appeal arises from a hearing and determination upon remand of *Borders v. Board of Education,* 259 Md. 256, 269 A. 2d 570 (1970), a case which we, in a *Per Curiam* opinion, characterized as involving "inverse racial discrimination." The original actions were brought under the Declaratory Judgment Act, Code (1971 Repl. Vol.) Art. 31A. The lower court had sustained the defendant's demurrers to the declarations which, in view of *Merc.-Safe Dep. & Tr. v. Reg. of Wills,* 257 Md. 454, 459, 263 A. 2d 543 (1970) ; *Garrett County v. Oakland,* 249 Md. 400, 240 A. 2d 228 (1968) ; and *Hunt v. Montgomery*

*County,* 248 Md. 403, 237 A. 2d 35 (1968), we held inappropriate and directed that upon remand a declaration of the rights of the parties be made after a full evidentiary hearing. Not being satisfied with the declaration of their rights on remand, as delineated by the lower court, the complainants again appeal. The two actions originally filed were consolidated on the first appeal. This Court also suggested that upon remand, the Circuit Court for Prince George's County delay its determination of the case until after the disposition by the Supreme Court of the United States of *Swann v. Charlotte-Mecklenburg Board of Education,* and its related companion cases. As we shall later discuss, the Supreme Court has now disposed of *Swann et al. v. Charlotte-Mecklenburg Board of Education et al.,* No. 281; *McDaniel, Superintendent of Schools, et al. v. Barresi et al.,* No. 420; *Davis et al. v. Board of School Commissioners of Mobile County et al.,* No. 436; *Moore et al. v. Charlotte-Mecklenburg Board of Education et al.,* No. 444; and *North Carolina State Board of Education et al. v. Swann et al.,* No. 498, all decided April 20, 1971, and reported at 402 U. S. 1, *et seq.* (1971).

The appellants, complainants below, are the parents of school age children in the Cheverly and Radiant Valley sections of Prince George's County. They alleged in their petition for declaratory and injunctive relief that through redistricting, their children, solely because they are members of the white race, are being transferred from the schools they previously attended to the two remaining all black schools in the County; namely, Fairmont Heights High School and Mary Bethune Junior High School. They claim this redistricting by the Board of Education of Prince George's County (Board) is in violation of: the Fourteenth Amendment of the United States Constitution; Article 2, Maryland Declaration of Rights; 20 U.S.C. § 884; and Title IV, 1964 Civil Rights Act, § 601, *et seq.* The Board and Board of County Commissioners for Prince George's County were the original defendants; however, on January 28, 1971, the lower

court dismissed, without prejudice, the suit as to the Board of County Commissioners.

The manner in which the appellants attempt to cast the issues points out the weakness in their case. They would frame the issues as follows:

"1. Is the transfer of students in a manner which requires a longer school day, some personal danger in terms of traffic safety, and other personal inconveniences which are not visited on fellow-students in the same local area, a violation of these students' constitutional rights, when the transfer is effected solely as a result of and on the basis of the skin color of the child?

"2. Is a member or members of Prince George's County School Board exempt from constitutional sanctions protecting individual rights when he or they purport to act in compliance with the request of federal authorities?"

In point of fact, these issues are contrived, as they embrace gratuitous assumptions which place the appellants' case in a more favorable light, but assumptions which are not warranted from a reading of the record. With regard to the first issue, counsel for the appellants admit they have not made out a case of constitutional hardship to the student resulting from the busing; and, as we read the record, it does not justify the conclusion that a desire to achieve "racial balance" was the sole reason for busing the children. The second issue which calls for a legal consideration of the immunity or exemption attached to the action of the Board from constitutional sanctions protecting the rights of individuals when its actions are in response to a demand or request from the federal authorities, is one we are not required to reach as, in actuality, all that is before us is whether the Board was unduly influenced by any undue pressures exerted upon it by the Department of Health, Education and Welfare (HEW). We shall answer this last mentioned

question in the course of this opinion, however, we view the basic issue before us as the one simply stated by the court below, namely:

"Is the Board of Education constitutionally prohibited from taking race into account in establishing attendance lines for the purpose of reducing segregation in public schools?"

Before discussing the legal ramifications attendant upon the redrawing of the school attendance lines, it is necessary to turn again to a consideration of the facts in this case. The lower court summarized its interpretation of the facts as follows:

"Resolution of the factual dispute will involve no prolixity. We find that the Board sought a better racial balance in the two remaining all black schools in the County * * * and that to achieve this proper and justified purpose, changes were made in the attendance zones, that the routes, distances and time schedules followed by the buses which implement the changes in attendance boundaries result in no substantial hardship, that the members of the Board were not subjected to any coercion or improper influence, and that the Board's paramount consideration was the proper education of the students."

The record extract comprises some 497 pages of testimony and exhibits. We do not intend to dwell in detail upon the facts other than to set forth some observations necessary for an understanding of the conclusions which we reach. The resolution of the Board, directing the transfer of children from other schools to Fairmont Heights High School and to Mary Bethune Junior High School, around which this controversy revolves, was passed on November 11, 1969, at a meeting attended by 9 members of the Board. Five members of the Board voted in favor of the resolution, 3 against (including the

President of the Board) and 1 member abstained from voting. In our opinion, and this view was obviously shared by the circuit court, the record reveals that the achievement of racial balance was not the sole consideration of the majority of the Board members in voting for the resolution, nor were they threatened or intimidated by the actions of HEW in pursuing this course of action.

Mr. James Galoto, a member of the Board, acknowledged that he felt there was a "moral obligation to desegregate these schools"; however, he testified that although achieving a degree of racial balance was one reason for the Board's action, that there were others. In fact at one point he said that there was a "conglomerate of reasons." He also said that he knew of no specific threat on the part of HEW to suspend the allotment of funds.

Another member of the Board, Dr. Joseph Righton Robertson, Jr., testified that he viewed desegregation of schools as "educationally sound" and noted that in the instant case it was done "to redraw the attendance areas so as to achieve meaningful balance of the races not only in Fairmont Heights but also in Bladensburg and other schools." He likewise stated that his vote was "by no means" based upon the threat of resulting loss of federal funds.

Mrs. Joanne T. Goldsmit stated that she was not pressured by HEW officials in casting her affirmative vote. She likewise stated that she voted in the manner in which she did because she thought that the children being transferred "were going to gain tremendously in educational benefits." She likewise stated that she really did not consider the transportation of the students as being properly characterized as "busing," as the distance of the transportation was inconsequential. She also reiterated that one of the reasons for transporting the students to Fairmont Heights was because of the "overcrowded situation at Bladensburg Senior High School."

Mrs. Ruth S. Wolf, a member of the Board at the time of the adoption of the resolution, and president of the

Board at the time she testified, was emphatic in her testimony that the achieving of racial balance in the two schools affected was not the primary reason for her voting for the resolution. She cited the fact that Fairmont Heights was not being used to its capacity and that generally she felt that the transfer of students to both schools was educationally sound and was a necessity for the purpose of teaching children "how to live in a multi-ethnic society." Mrs. Wolf likewise minimized the pressures that HEW played in the Board's decision.

Finally, Mr. Jesse J. Warr, also one of the Board members voting with the majority, stated that he voted his own personal convictions and that achieving racial balance was just one facet that motivated him. He referred to other considerations such as educational philosophy, change in book selections and teacher ratio. He was clear in his recollection that HEW did not threaten to withhold specific funds in order to force compliance with its recommendations.

Indeed, most of the members of the Board voiced the belief that the threats of withholding federal funds did not emanate from HEW but, rather, were the machinations of the news media in their desire to sensationalize the dire consequences that might be in store in the event of failure of compliance.

In discussing the testimony of the members of the Board who voted with the majority bloc, we must not lose sight of the principle of law enunciated in *Williams v. McCardell,* 198 Md. 320, 330, 84 A. 2d 52 (1951) and restated by Judge Oppenheimer, writing for the Court, in *Bernstein v. Board of Education of Prince George's County,* 245 Md. 464, 477, 226 A. 2d 243 (1967), that "* * * [S]ometimes the opinion of a board or testimony of one of its members may show that its action was arbitrary or unlawful, but ordinarily courts review the action of the board, not its opinion. * * *" We would also note that it is to be presumed that the Board in exercising the discretion reposed in it will be guided and influenced by considerations affecting the whole school system and the

public welfare.[1] Cf. *Murphy v. State Roads Comm'n,* 159 Md. 7, 17, 149 A. 566 (1930). Likewise in *Bernstein v. Board of Education, supra,* at 476 the Court remarked:

> "* * * This Court has consistently recognized that, in general, courts will not attempt to substitute their judgment for the expertise of school boards, acting within the limits of the discretion entrusted to them. * * *
> "* * * The appellants have the burden of showing that the Board's action was illegal or an abuse of discretion, and this burden they have not met."

Before leaving our discussion of the facts, it should be stated that the appellants failed to make out any case supporting their claim that the transfer of the students presented any actual personal danger in terms of traffic safety and in personal inconvenience of any substantial nature. The appellants in their brief state that the additional mileage involved in transporting the students to the two schools affected is approximately two to six miles more distant than from the original neighborhood schools. As stated at the outset of this opinion, upon argument of the case, counsel for the appellants conceded that no constitutional hardship was involved. See *Swann, supra,* 402 U. S. 1, 26, 27 (1971).

There appears to be little dispute but that when *Brown v. Board of Education,* 347 U. S. 483 (1954), and *Brown v. Board of Education,* 349 U. S. 294 (1955), generally referred to as *Brown I and II,* were decided, the Board acted in good faith to establish a unitary school system within Prince George's County. In an effort to abolish the old dual system and promote desegregation, the Board, like many others throughout the nation, adopted the "freedom of choice" policy, under which the Negro

---

1. Code (1969 Repl. Vol.) Article 77, Section 42:
"The county board of education, with the advice of the superintendent of schools, shall determine the geographical attendance areas for all such schools established under the provisions of this section."

parent was given the privilege of enrolling his child in the school that was closest to his residence. However, there were places where this plan did not achieve the desired results, particularly in those areas where, because of housing patterns, dense and shifting populations and complex traffic congestion, segregation persisted. Finally in 1968 the United States Supreme Court in *Green v. County School Board,* 391 U. S. 430, held that in many areas the policy of "freedom of choice" actually perpetuated the constitutionally objectionable dual system and that an affirmative obligation existed in every such school district to take that action which may be necessary to immediately terminate racially identifiable schools. However, it should be noted that in *Green,* the court was unquestionably confronted with a *de jure* segregated background in the school system.

It is against this legal backdrop that the present litigation arose when the school attendance lines were redrawn resulting in the transfer of students from Bladensburg High School and Bladensburg Junior High School to Fairmont Heights Senior High School and Mary Bethune Junior High School, these latter two schools being the last all Negro schools in the County. At the time this controversy reached this Court, as we have already noted, there was another landmark case, *Swann v. Charlotte-Mecklenburg Board of Education,* 402 U. S. 1 (1971), and its companion cases pending before the United States Supreme Court, one of which involved a test of the constitutionality of a North Carolina anti-busing statute. An interesting and thorough compilation of cases covering a myriad of decisions presenting the problems and issues encountered from *Brown, supra,* to *Swann, supra,* may be found in 4 A.L.R. Fed. 979 (1970) and (Supp. 1971) ; 11 A.L.R.3rd. 780 (1967) ; and 38 A.L.R.2d. 788 (1954). The magnitude of the litigation involved may be gleaned from the observation made by Mr. Chief Justice Burger, writing for a unanimous Court in *Swann,* wherein he notes that in the Fifth Federal Circuit alone there were 166 appeals in school desegregation cases heard between December 2, 1969 and September 24, 1970. *Swann, supra,*

at 14, n. 5. The announced purpose of the opinion in *Swann* was, "* * * to amplify guidelines, however incomplete and imperfect, for the assistance of school authorities and courts. * * *" *Swann* at 14. We think the answer to the issues presented by this case are provided in the guidelines articulated in *Swann* and that the Board may properly take into account the race of school children in redrawing the attendance lines.

In the instant case, on the theory that the Board was acting under the pressure applied by HEW, the appellants contend that the action of redrawing the school attendance lines violated Title IV of the Civil Rights Act of 1964, 42 U.S.C., § 2000c, and 20 U.S.C., § 884. As we have before stated, the record does not support the claim that the Resolution of the Board, which effected the transfer of the students, was a result of any HEW mandate, but, separate and apart from this, we think that this contention is without legal merit. In *Swann,* an objection was likewise voiced that the action of redrawing the attendance line constituted a violation of Title IV of the Civil Rights Act of 1964, § 2000c(b) and § 2000c-6. However, the Court in *Swann* held that Title IV of the Civil Rights Act of 1964 and particularly § 2000c-6 was designed simply to foreclose any interpretation of the Act as expanding the existing powers of the federal courts to enforce the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution, noting, however, that it did not withdraw from federal courts their historic equitable remedial powers.[2] *Swann,* at 16-17.

---

2. Title 20, United States Code, Section 884.
"Nothing contained in this act shall be construed to authorize any department, agency, officer or employee of the United States to exercise any direction, supervision, or control over the curriculum program of instruction, administration or school system, or over the selection of library resources, textbooks or other printed or published instructional material by any educational institution or school system, or to require the assignment or transportation of students or teachers in order to overcome racial imbalance.
Title 42, United States Code, Section 2000c-6(a)(2), provides in part:
"[Provided that nothing herein shall empower any official

The language in *Swann,* which we find particularly apposite to the case at bar is: "* * * In these circumstances, we find no basis for holding that the local authorities may not be required to employ bus transportation as one tool of school desegregation. * * *." This is significant when we note that in *Swann,* the busing of the students was for a far greater distance than that required in the instant case, which is minimal. We would also point out that even in *Swann,* the guidelines offered by the Court leave no doubt that each case must be reviewed on its own individual merits and that busing to achieve racial balance is not to be permitted in those situations "* * * [w]hen the time or distance of travel is so great as to risk either the health of the children or significantly impinge on the educational process. * * * It hardly needs stating that the limits on the time of travel will vary with many factors, but probably with none more than the age of the students."

Although it may be argued that *Swann* represents a case wherein *de jure* segregation existed in the school system which was brought about as a direct result of state action, whereas, by contrast, in the present case *de facto* segregation prevailed, nonetheless, we find *Swann* helpful in answering the issues before us. *Swann* does hold that where it is possible to identify a white school or a Negro school, "a *prima facie* case of violation of substantive constitutional rights under the Equal Protection Clause is shown." *Swann* at 18. In the case at bar, Fairmont Heights High School and Mary Bethune Junior High School were the last all Negro schools in the County. We think that if it is constitutionally permissible to require busing to achieve racial balance in a situation where *de jure* segregation exists, *a fortiori,* it is permissible to recognize the achieving of racial bal-

---

or court of the United States to issue any order seeking to achieve a racial balance in any school by requiring the transportation of pupils or students from one school to another or one school district to another in order to achieve such racial balance, or otherwise enlarge the existing power of the court to insure compliance with constitutional standards."

ance, as one of the reasons, for redrawing school attendance lines with the resulting busing of students to accomplish this where such busing imposes no constitutional hardship.[3] Such a proposition is in keeping with the language of *Offermann v. Nitkowski*, 378 F. 2d 22, 24 (2nd Cir. 1967), a case quite similar on the facts to the case at bar, wherein the Court stated, "That there may be no constitutional duty to act to undo *de facto* segregation, however, does not mean that such action is unconstitutional. * * *."

Moreover, there is authority to the effect that, "* * * extant de facto segregation intentionally maintained and perpetuated by racially motivated state action becomes constitutionally proscribed de jure segregation." See *People v. San Diego Unified School District*, 96 Cal. Rptr. 658, 663 (Ct. of App. 1971) and cases cited therein; and cf. *Spencer v. Kugler*, 326 F. Supp. 1235, 1243 (D.N.J. 1971). While in the present case, were the appellants to be successful there would be no justifiable grounds for anyone to claim that the failure to redraw the attendance lines was racially motivated, yet an indefinite continuation of the present attendance lines might well raise such a presumption.

Elsewhere, *Swann*, at 16, recognizes that in this "pluralistic society" in which we live, school boards frequently recognize that it may be helpful to the student, in order to prepare him for life, to attend a school where there is a mixture of races. Certainly, the record in the instant case supports the conclusion that, at least some members of the Board thought this exposure to be educationally beneficial. We would again stress that in the case at bar, the evidence supports the conclusion that the achieving of racial balance was not the sole reason for the passage of the Resolution by the Board whereby the attendance lines were redrawn. We do not by this statement mean to imply that, were the only reason for pass-

---

3. For those interested in speculation as to how problems facing a unitary educational system may be solved in the future, see Article titled "If Busing Won't Work, What is the Answer?" by James S. Coleman, the Sunday Sun, Baltimore, Md., April 22, 1972.

ing the Resolution that of achieving racial balance, our decision in this case would be different. We simply state that we are not called upon to decide that issue as that is not the case before us.

In our *Per Curiam* opinion rendered in this case (259 Md. 256), we remanded it for an evidentiary hearing and a declaration of the rights of the parties. *Woodland Beach Property Owners' Assn. v. Warley,* 253 Md. 442, 252 A. 2d 827 (1969). While the lower court on remand, by its refusal to grant the injunctive relief requested by the appellants and by dismissing their bill, citing its reasons therefor, may have inferentially made a declaration of the rights of the parties involved, yet, we think that it should have made an express declaration.

Therefore, in view of what we have stated in this opinion, we conclude that under the facts of this case, it was permissible for the Board in redrawing attendance lines to take into consideration the element of racial balance and that the Board properly bused the students thus transferred as there was no constitutional hardship imposed.

We will remand this case so that the court may modify its order of dismissal by conforming it to the above declaration and we affirm the order as modified.

> *Case remanded for the passage of a declaration and order conformable to the views expressed in this opinion.*
>
> *Appellants to pay the costs.*